IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| INDUSTRIAL INSULATION GROUP, } | |
| LLC (SUCCESSOR OF CALSILITE } | |
| MANUFACTURING CORP, INC.), } | |
| } | |
|     *Plaintiff*, } | Civil Action No. H-08-3482 |
| v. } | |
| } | |
| C. GARY SPROULE, III, SPROULE } | |
| MANUFACTURING CO., INC.; and } | |
| S&B CONSULTING, LLC, } | |
| } | |
|     *Defendants*. } | |

**OPINION AND ORDER**

        On November 25, 2008, Plaintiff Industrial Insulation Group, LLC, Successor of Calsilite Manufacturing Corp., Inc., ("IIG") filed a Verified Complaint for Injunctive and Other Relief (Doc. 1) against Defendants C. Gary Sproule, III ("Sproule"), Sproule Manufacturing Co., Inc. ("SMC"), and S&B Consulting, LLC ("S&B") alleging causes of action for breach of contract, breach of fiduciary duty, and misappropriation of trade secrets. On December 2, 2008, the parties filed an agreed temporary restraining order (Doc. 6), and on December 15 and 17, 2008, the Court held a preliminary injunction hearing. For the reasons set forth below, the Court shall GRANT the plaintiff's request for a preliminary injunction against the defendants.

I.        <u>Background and Relevant Facts</u>

        Prior to August 1988, SMC and its owner, Sproule, manufactured and sold perlite pipe covering, block insulation, and pipe fitting covers. At the time, SMC was the only United States-based manufacturer of ASTM-compliant perlite pipe insulation as a result of Sproule's research and development. In August and September 1988, SMC entered into two agreements

with Calsilite Manufacturing Corp., Inc. ("Calsilite"), an Asset Purchase Agreement (the "APA") and a License Agreement (the "LA"), both of which Sproule executed as an individual and as President of SMC. Additionally, in September 1988, Calsilite and Sproule entered into the Calsilite/Sproule Employment Agreement (the "EA").

In accordance with the terms of the APA executed on August 19, 1988, Calsilite purchased from SMC various assets used in the pipe covering and block insulation business, and SMC continued in the pipe fitting cover business. SMC transferred several assets to Calsilite, most importantly,

> [a]ll drawings, specifications, technical data (including test results), formulae, processes, trade secrets and know-how, whether or not patentable or otherwise protectable and whether or not at a commercial stage, related to the use of perlite or any other mineral or material in Seller's business, and all of Seller's rights to use, disclose and prevent the disclosure of the foregoing, except as herein provided

(the "Trade Secrets"). (Pl.'s Ex. 5 at 2). Calsilite, in exchange for the Trade Secrets and several other assets of SMC, made a cash down payment, additional specified payments, and royalty payments to SMC. (*Id.* at 3-6).

In order for SMC to continue its pipe fitting cover business, it required access to the Trade Secrets. Accordingly, the parties included a licensing provision in the APA allowing SMC to use the Trade Secrets on the condition that,

> Seller shall agree not to disclose such items to any person or organization without the written consent of Buyer and shall notify Buyer of improvements and/or changes thereto made by Seller affecting or possibly affecting in any way the pipe cover business which shall become the sole property of Buyer and shall be included in and subject to this license.

(*Id.* at 13). The parties supplemented this provision shortly thereafter with the LA.

On September 30, 1988, Calsilite and Sproule executed the LA outlining SMC's rights to use the Trade Secrets in its pipe fitting cover business. (Pl.'s Ex. 6). The main issue in this case involves the LA's nondisclosure provision, which states,

> Licensee shall not, directly or indirectly, disclose or disseminate the Trade Secrets, or any portion thereof, to any person or organization other than Licensor without Licensor's written consent. If, in the opinion of Licensor, the Trade Secrets become generally known, then, with Licensor's prior written consent, the restrictions contained in this Agreement shall cease to be in effect.

(*Id.* at 1).

On the issue of with whom Licensee may interact, the LA states, in pertinent part,

> Licensee shall not acquire, be acquired by, merge or consolidate with a Conflicting Organization, nor enter into negotiations therefore without the prior written approval of Licensor.

(*Id.*). A Conflicting Organization is "any person or organization, or any person or organization controlled by, controlling or under common control with said person or organization, who or which is engaged in, or is about to become engaged in, the research, development, manufacture or sale of a Conflicting Product, and a Conflicting Product is "any product, directly or indirectly, similar to the products manufactured in any way and to any extent using the Trade Secrets including, without limitation, pipe coverings and block insulation." (*Id.*). This provision also prohibits Sproule from entering in the employment of or directly or indirectly being retained by a Conflicting Organization except as he is permitted under paragraph 6.1(e) of the APA. (*Id.*).

With respect to the issue of Improvements in the Trade Secrets, the LA provides,

> Licensee shall promptly notify Licensor of any Improvement in the Trade Secrets, or any portion thereof, which Improvement shall automatically become the sole property of Licensor and be included in and subject to this Agreement.

(*Id.* at 2).  An Improvement is "any modification, variation or revision in or to the Trade Secrets, or any portion thereof, which the Licensee or Licensor may conceive or develop and which affects or possibly affects Licensor's pipe cover and block insulation business."  (*Id.*).

In addition to the licensing provision, the APA included a summary of the terms and conditions of an employment agreement between Calsilite and Sproule.  (Pl.'s Ex. 5 at 9-11).  This was later supplemented by the EA, which states, in relevant part,

> Employee shall devote his best efforts and approximately 50 percent of his time (a) to consulting with assisting Employer in the design and construction of a facility in Brunswick, Georgia, for the manufacture of perlite pipe covering and block insulation, including the installation of necessary machinery and equipment therein, and (b) to managing the Employer's Pennsylvania facility engaged in the perlite pipe covering and block insulation business.

(Pl.'s Ex. 17 at 1).  The EA also included a restrictive covenant prohibiting Sproule from directly or indirectly competing with Calsilite in the perlite pipe covering and block insulation business in North America and Western Europe until September 30, 1995.  (*Id.* at 3).

Twenty years after these three agreements were executed, the events giving rise to this action began.  Specifically, on October 21, 2008, ITW Insulation Systems ("ITW"), a competitor of IIG, issued a press release announcing a "strategic alliance" and "strategic partnership" with SMC.  It states, in pertinent part,

> With the assistance of Owner, [Sproule], and his professional team, ITW will be constructing a new state-of-the-art Perlite facility in Houston.  Utilizing ITW's financial strength and market presence in association with [Sproule's] 30+ years of Perlite manufacturing and industry experience.  This new plant represents a tremendous growth opportunity for [ITW] and plans are to be fully operational within the next 12 months.

(Pl.'s Ex. 7).  It also mentions ITW's recent purchase of perlite facilities in Monterrey, Mexico and Kuala Lumpur, Malaysia, and states that these two acquisitions, in addition to the

construction of a new facility in Houston, "display the confidence ITW Insulation Systems has in the Perlite product as a superior insulation that reduces mechanical abuse and combats corrosion under insulation (CUI) in power plants and petrochemical applications." (*Id.*).

Shortly thereafter, on October 30, 2008, Sproule emailed Philippe Delouvrier, President of IIG, ("Delouvrier"). Sproule advised Delouvrier that he would abide by their contract, that he would not reveal "any formulation, forming methods, or other trade secrets" used by IIG to manufacture perlite pipe covering or block insulation, and that he would strictly be concentrating on improving the Pamsil formulation ITW purchased in Mexico. (Pl.'s Ex. 8).

In response, Wenke B. Thoman, Vice President of IIG, ("Thoman") emailed Sproule on October 31, 2008, to inform him that he could not cooperate with ITW without breaching the APA and the LA. (Pl.'s Ex. 9). Additionally, Thoman advised Sproule that there was nothing in the public domain about perlite pipe technology and that any disclosure about the existing formula or processes or any improvements thereof would violate the APA and the LA. (*Id.*). Moreover, on November 6, 2008, in accordance with paragraphs 19(b) and 20.6 of the APA, IIG forwarded a Notice of Default to both SMC and Sproule. (Pl.'s Ex. 10). IIG also provided ITW with written notice on November 7, 2008, that its "strategic partnership" plans with SMC and Sproule would violate IIG's ownership rights in the Trade Secrets. (Pl.'s Ex. 11).

On November 12, 2008, ITW issued an updated press release which it enclosed in its November 13, 2008, correspondence to IIG. In its letter to IIG, ITW explains that its earlier press release had been incorrect and then states, in relevant part,

> ITW has not entered into a strategic alliance with [SMC]. In fact [ITW] has retained [S&B] to provide consulting services regarding (1) the existing Perlite formulations owned by and used by [ITW] at its facilities in [Monterrey and Kuala Lumpur], (2) the construction [of] a Perlite facility for [ITW] in [Houston] using [ITW's] Perlite formulations and technologies, [and] (3) the

>    possible development of new technology in the areas of mixing, block forming, drying, and packaging.

(Pl.'s Ex. 12). During the preliminary injunction hearing, Sproule testified that he and his partner, George Bauer (Bauer), formed S&B for the purpose of entering into the Consulting Agreement (the "CA") with ITW. Sproule owns 94% of S&B, while Bauer owns 6%.

S&B and ITW executed the CA on October 15, 2008. Under the terms of this agreement, S&B will consult, design, and/or provide the following services to ITW: (1) laboratory for the development and testing of perlite silicate formulations, (2) develop software to track and compare all data gathered from experiments, (3) improve thermal conductivity, reduce friability, and decrease overall breakage of product, (4) perlite silicate mixing system, (5) perlite sectional and block forming system, (6) perlite sectional and block drying methods, (7) perlite sectional and block packaging methods, (8) perlite expansion system, (9) project to improve perlite strength to reduce breakage propensity. (Def.'s Ex. 1 at 1).

IIG alleges that the defendants will use the Trade Secrets in the course of consulting ITW, and, as a result, IIG argues that it stands to lose proprietary and trade secret information, as well as significant customers, goodwill, and revenues. If the defendants are not barred from violating the APA and the LA, using the Trade Secrets in violation of these agreements, and participating in activities that violate their obligations under these agreements, IIG claims that it will suffer irreparable harm. IIG has, therefore, requested a preliminary injunction restraining and enjoining the defendants from (1) working for or acting as an employee, partner, stockholder, investor, owner, director, agent, or consultant for a competitor of IIG (including, but not limited to, ITW); (2) ever using or disclosing any of IIG's Trade Secrets and any other confidential, proprietary, or trade secret information or property contrary to the

terms of the APA and the LA; and (3) interfering, in any way, with any current customer or employee relationships of IIG.

The defendants disagree and make several arguments in response. First, they claim that the nondisclosure provisions are unenforceable. If, however, the Court finds that the nondisclosure provisions are enforceable, the defendants then argue that the Trade Secrets are no longer trade secrets. Should the Court determine that the nondisclosure provisions are enforceable and that the Trade Secrets are still trade secrets, the defendants claim that they will not disclose the Trade Secrets to ITW during the term of the CA.

II.        Discussion

   A.     Shall the Court apply New York, Pennsylvania, or Texas law?

The Court must first address whether to apply Pennsylvania or Texas law to this case. In their respective briefs, the parties address whether the Court should apply New York, Pennsylvania, or Texas law. While the Court will conduct an analysis on whether to apply Pennsylvania or Texas law, it will not do so with respect to New York law. In this case, the only reference to New York law is in the choice of law clause in the EA's restrictive covenant. However, this restrictive covenant expired on September 30, 1995.

"Under Texas law, where the parties to a contract dispute have agreed to an enforceable choice of law clause, the court must apply the law of the state upon which they agreed." *Int'l Interests, L.P. v. Hardy*, No. Civ.A. H-03-2418, 2004 WL 3998092, at * 3 (S.D.Tex. Nov. 17, 2004) (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 678 (Tex. 1990)). Texas courts apply section 187 of the RESTATEMENT (SECOND) OF CONFLICT OF LAWS when determining whether a choice of law clause is enforceable. *Id.* (citing *DeSantis*, 793 S.W.2d at 678). This provision states, in pertinent part,

> (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.
>
> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>
>> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>>
>> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 187.

The Court declines to decide whether the issues in this case are ones which the parties could have resolved by an explicit provision in their agreements. Instead, the Court applies § 187(2) and concludes that Pennsylvania law shall govern the contractual rights and duties of the parties. The chosen state, Pennsylvania, has a substantial relationship to the parties and the transaction at issue, and there is a reasonable basis for the parties' decision to apply Pennsylvania law. The APA, the LA, and the EA were all consummated in Pennsylvania. SMC is a Pennsylvania corporation with its principal place of business in Devault, Pennsylvania, and Sproule is a Pennsylvania resident. The Court notes that, at the time these agreements were executed, Calsilite was a Delaware corporation with its principal place of business in Brunswick, Georgia.

Additionally, Texas does not have a materially greater interest than Pennsylvania in the outcome of this case. While Sproule has moved his manufacturing facility to Houston, and the plaintiff, as well as the defendants, do business in Texas, these facts alone are not sufficient to give Texas a materially greater interest in this case than Pennsylvania has. Furthermore, the application of Pennsylvania law with respect to standing, the enforceability of a nondisclosure provision, and the elements of a trade secret misappropriation claim are not contrary to fundamental policies of Texas.

B.     Does the plaintiff, IIG, have standing to bring the instant suit?

The defendants contend that IIG lacks standing to enforce the APA and the LA executed by Calsilite and SMC. IIG makes two arguments in response. IIG is a joint venture between Calsilite and Johns Manville and that Calsilite owns a 71% interest in it. Because Calsilite owns a controlling interest in and does business through IIG, IIG claims that it has standing. Additionally, IIG is a successor-in-interest to Calsilite, and both the APA and the LA explicitly state that they "shall be binding upon and shall inure to the benefit of the parties and their respective successors." (Pl.'s Ex. 5 at 39; Pl.'s Ex. 7 at 2).

The constitutional minimum of standing has three elements. First, the plaintiff has suffered an "injury in fact," that is, an invasion of a legally protected interest that is (a) concrete and particularized and (b) "actual or imminent, not 'conjectural or hypothetical.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations and footnotes omitted). Second, there is a causal connection between the injury and the conduct of which the plaintiff complains. *Id.* (citations omitted). Third, it is "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Id.* (citations omitted).

The Court finds that the plaintiff has standing to bring suit. Calsilite controls and does business through IIG, and, therefore, it would suffer an "injury in fact" if the defendants violated the nondisclosure provisions and misappropriated the Trade Secrets at issue in the instant case.[1]

Furthermore, as a successor-in-interest to Calsilite, IIG is a third-party beneficiary of both the APA and the LA. Under Pennsylvania law, "in order for a third party beneficiary to have standing to recover on a contract, both contracting parties must have expressed an intention that the third party be a beneficiary, and that intention must have affirmatively appeared in the contract itself." *Global Ground Support, LLC v. Glazer Enterprises, Inc.*, 581 F. Supp. 2d 669, 674 (E.D.Pa. 2008) (quoting *Burks v. Fed. Ins. Co.*, 883 A.2d 1086, 1088 (Pa. Super. Ct. 2005)). Both Calsilite and SMC expressed an intention that their respective successors be beneficiaries of the APA and the LA. This intention affirmatively appears in both agreements.

      C.    <u>Is a preliminary injunction appropriate in this case?</u>

A party seeking a preliminary injunction must establish the following elements by a preponderance of the evidence: (1) there is a substantial likelihood the party will prevail on the merits; (2) a substantial threat exists that irreparable harm will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm to the defendants; and (4) the granting of the preliminary injunction will not disserve the public interest. *Karaha Bodas Co. v. Negara*, 335 F.3d 357, 363 (5th Cir. 2003). A preliminary injunction is an extraordinary remedy that should not be granted unless the party seeking it has "clearly carried the burden of persuasion" on all elements. *Lake Charles Diesel, Inc. v. General Motors Corp.*, 328 F.3d 192,

---

[1] The Court declines to address the second and third elements of the standing requirement. In their briefing and at the preliminary injunction hearing, the defendants did not address either of these. Their arguments focused on whether the plaintiff suffered an injury in fact and if Calsilite assigned its interests in the APA and the LA to IIG.

195-96 (5th Cir. 2003) (quoting *Mississippi Power & Light Co. v. United Gas Pipeline Co.*, 760 F.2d 618, 621 (5th Cir. 1985)).

The plaintiff must demonstrate a substantial likelihood that it will prevail on the merits of its case. The Court finds that the plaintiff has met its burden. First, the plaintiff has demonstrated that the nondisclosure provisions in the APA and the LA are, in fact, enforceable. Second, even if the nondisclosure provisions were not enforceable, the trade secrets are entitled to protection independent of such provisions.

The nondisclosure provisions in the APA and the LA are enforceable under Pennsylvania law. In an attempt to argue that the nondisclosure provisions in these two agreements are unenforceable under Pennsylvania law, the defendants incorrectly identify these provisions as restrictive covenants.

Restrictive covenants are disfavored but enforceable if (1) they are ancillary to an employment relationship between the parties; (2) they are supported by adequate consideration; (3) the restrictions imposed by the covenant are reasonably necessary for the protection of legitimate interests of the employer; and (4) the restrictions imposed are reasonably limited in duration and geographic extent. *Fisher Bioservices, Inc. v. Bilcare, Inc.*, No. Civ.A. 06-567, 2006 WL 1517382, at * 10 (E.D.Pa. May 31, 2006) (citing *Hess v. Gebhard & Co.*, 808 A.2d 912, 917 (2002); *Thermo-Guard, Inc. v. Cochran*, 596 A.2d 188, 193-94 (1991)). However, as the Pennsylvania courts have stated, "the 'non-disclosure' covenant is not limited by the reasonableness criteria applicable to 'non-competition' covenants." *Insulation Corp. of America v. Brobston*, 667 A.2d 729, 735 n. 7 (1995) (citing *Bell Fuel Corp. v. Cattolico*, 544 A.2d 450, 458 (1988)). *See also United Products Corp. v. Transtech Mfg., Inc.*, No. 4051, 2000 WL 33711051, at * 20 (Pa.Com.Pl. Nov. 9, 2000) (holding that a confidentiality agreement is not

subject to the criteria applicable to a restrictive covenant). Accordingly, the Court finds the nondisclosure provisions in both the APA and the LA enforceable under Pennsylvania law.

Even if the Court found the nondisclosure provisions in the APA and the LA unenforceable, the plaintiff's trade secrets are still entitled to protection under Pennsylvania law. The Court shall apply the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa. Cons. Stat. Ann. § 5301 *et seq.*, to the instant cause because the alleged actual or threatened trade secret misappropriation has occurred or will occur after the effective date of the statute, April 19, 2004. The PUTSA defines a trade secret as:

> Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that
>
> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, or
>
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*B&B Microscopes v. Armogida*, 532 F. Supp. 2d 744, 756 (W.D.Pa. 2007) (quoting 12 Pa. Cons. Stat. Ann. § 5302). In considering whether information is a trade secret, the Court may consider:

> (1) the extent to which it is known outside the owner's business;
>
> (2) the extent to which it is known by employees and others involved in the owner's business;
>
> (3) the measures taken by the owner to guard the secrecy of the information;
>
> (4) the value of the information to the owner and his competitors;
>
> (5) the amount of effort or money expended by the owner in developing the information; and

> (6) the ease or difficulty with which the information could be properly acquired by others.

*Brett Senior & Assocs., P.C. v. Fitzgerald*, Civil Action No. 06-1412, 2007 WL 2043377, at * 6 (E.D.Pa. July 13, 2007) (footnote omitted) (citing *Iron Age Corp. v. Dvorak*, 880 A.2d 657, 663 (Pa. Super. Ct. 2005)).

> Under the PUTSA, a misappropriation of trade secrets includes the following:
>
> (1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (2) disclosure or use of a trade secret of another without express or implied consent by a person who:
>
>> (i) used improper means to acquire knowledge of the trade secret;
>>
>> (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
>>
>>> (A) derived from or through a person who had utilized improper means to acquire it;
>>>
>>> (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>>>
>>> (C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>>
>> (iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

12 Pa. Cons. Stat. Ann. § 5302. *See also Ideal Aerosmith, Inc. v. Acutronic USA, Inc.*, Civil Action No. 07-1029, 2008 WL 4822537, at * 2 (W.D.Pa. Nov. 4, 2008).

Under Pennsylvania law, a plaintiff is entitled to injunctive relief to prevent the use and disclosure of a trade secret if:

> (1) the information constitutes a trade secret;
>
> (2) the information has value to its owner and is important in the conduct of the owner's business;
>
> (3) by reason of discovery of ownership, plaintiff has a right to use and enjoy the secret; and
>
> (4) the secret was communicated to the defendant while in a position of trust and confidence.

*Alturnamats, Inc. v. Harry*, Civil Action No. 07-337, 2008 WL 4279814, at * 9 (W.D.Pa. Sept. 16, 2008) (citing *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1255 (3d Cir. 1985); *A.M. Skier Agency, Inc. v. Gold*, 747 A.2d 936, 941 (Pa. Super. 2000)).

Injunctive relief may be necessary and appropriate "even where there is no indication that a defendant and/or a former employee have benefited from the former employer's trade secret, where an employee is employed in a position that will result in inevitable disclosure of a former employer's trade secrets." *Id.* (citing *Doebler's Pa. Hybrids, Inc. v. Doebler Seeds, LLC*, 88 Fed. Appx. 520, 522-23 (3d Cir. 2004); *Air Products and Chemicals, Inc. v. Johnson*, 442 A.2d 1114, 1124 (Pa. Super. 1982) (noting that injunctive relief was proper because the likelihood of disclosure was high where the duties the employee had to perform at his new employer would make it impossible for him not to disclose his former employer's trade secrets)). *See also* 12 Pa. Cons. Stat. Ann. § 5303(a).

The parties agree that details of the exact formulation, mixing methods, press specifications, tooling systems, and curing procedures were not widely known when the agreements were executed in 1988. The defendants, however, argue that, twenty years later, these processes and formulations are well-known in the industry and can be found online without a great deal of effort. For the reasons set forth below, the Court finds that the relevant processes and formulations for perlite manufacturing are trade secrets.

The processes and formulations for perlite manufacturing are not well-known outside of the plaintiff's business. The defendants contend that these processes and formulations are available in the public domain through a combination of patents and trade publications. The Court, however, disagrees. The United States Patent and Trademark Office issued Patent No. 4,446,040 (the "'040 Patent") on May 1, 1984, four years before the APA, the LA, and the EA were executed. (Def.'s Ex. 17). In arguing that the Trade Secrets that SMC sold to Calsilite in 1988 are no longer secret, the defendants rely primarily on the '040 Patent. The Court, however finds fault with such reliance. If the formulation in the '040 Patent and Sproule's formula were one and the same, Sproule's formula would not have been a trade secret in 1988 when the parties entered into their agreements. With respect to Sproule's perlite manufacturing process, the Court points to Sproule's testimony at the preliminary injunction hearing. There, he admitted that, prior to executing the CA, representatives of ITW visited his perlite manufacturing plant in Houston. However, before Sproule allowed them into the plant, he had each of them sign a confidentiality agreement. This indicates that Sproule did not want ITW, a competitor of his, to glean useful information that it could employ to create its own process.

Furthermore, the processes and formulations for perlite manufacturing are not well-known by employees and others involved in the plaintiff's business. At the preliminary injunction hearing, Rick Dolin ("Dolin"), an employee of IIG since 2002, testified that less than six employees at IIG know the complete formula and process for perlite manufacturing. Additionally, IIG required that he sign confidentiality, non-disclosure, and non-compete agreements at the start of his employment. This testimony demonstrates that IIG has taken serious measures to guard the secrecy of its confidential information.

The Trade Secrets at issue in this case which involve the formula and process for making perlite are extremely valuable to IIG, as well as its competitors, including ITW. IIG is the sole manufacturer or ASTM-compliant perlite in the United States. Calsilite expended a considerable amount of time, effort, and financial resources to purchase the Trade Secrets from Sproule in 1988 and use them to construct and develop a perlite plant of its own in Brunswick. Sproule testified that Calsilite paid him approximately $480,000 in compensation in 1988. Additionally, in accordance with the terms of the APA and the EA, Sproule acted as a consultant to Calsilite while it was constructing its facility in Brunswick. Prior to the APA, Sproule had been putting his product together on shoe strings, using wooden forms, a plywood box as a mixer and bathroom scales to weigh the product. By virtue of his consultancy position, Sproule had the opportunity to contribute to and learn firsthand how to apply his formula and process to a sophisticated and large-scale manufacturing operation.

The perlite manufacturing formula and process are not easy for others to acquire. As the Court stated earlier, competitors are typically required to sign confidentiality agreements before visiting the manufacturing facilities, and employees are often asked to sign non-disclosure and non-compete agreements to avoid having the information fall into the hands of a competitor. Dolin, who has had three patents issued to him for perlite wallboard and roofing, worked for Johns Manville before joining IIG in 2002. While he was at Johns Manville, he attempted to create perlite pipe insulation that would consistently meet ASTM standards. Even with his knowledge of the preexisting patents, Dolin failed to succeed. He testified that although the science involved in making perlite is disclosed in patents and journals, this process also involves art, which he described as the "know-how" of making the process work. It is the combination of the science and the art that allows one to make an ASTM-compliant product.

Although portions of both the formula and the process may be publicly accessible at this time, the combination of the formula and the process which enables the producer to consistently manufacture ASTM-compliant perlite remains a valuable trade secret.

Because the Trade Secrets at issue in this case, which include Sproule's formula and process for manufacturing perlite, remain trade secrets to this day, the Court must address the three remaining elements that must be satisfied for it to grant the plaintiff injunctive relief in order to prevent the use and disclosure of its trade secrets.

First, this information is valuable to IIG and is important in the conduct of its business. IIG's predecessor, Calsilite, is the only manufacturer of ASTM-compliant perlite in the United States. If one of IIG's competitors, for example, ITW, had access to the Trade Secrets IIG purchased from SMC in 1988, it will detrimentally affect IIG's business. Second, IIG, as a successor-in-interest to Calsilite, has a right to use and enjoy the Trade Secrets under the terms of the APA and the LA. Third, the Trade Secrets were communicated to the defendants in accordance with the licensing provisions in the APA and the LA. Sproule and SMC were able to continue to operate the Devault facility and use the Trade Secrets by virtue of these agreements they entered into with Calsilite. Accordingly, the Court finds that the plaintiff, IIG, is entitled to injunctive relief to prevent the use and disclosure of the Trade Secrets.

The parties dispute whether Pennsylvania has adopted the inevitable disclosure doctrine. The Court has reviewed the case law cited to by both parties and concludes that, although Pennsylvania courts have not explicitly adopted the inevitable disclosure doctrine, the United States Court of Appeals for the Third Circuit has predicted that the Pennsylvania Supreme Court would apply some variation of this doctrine under certain circumstances. *Doebler's Pa. Hybrids, Inc. v. Doebler Seeds, Inc.*, 88 Fed. Appx. 520, 522 n. 1 (3d Cir. 2004)

(citing to *Air Products*, 442 A.2d at 1124). The Court finds that the facts of the *Air Products* case are analogous to the instant case, while those of *Iron Age Corp. v. Dvorak*, 880 A.2d 657, 664 (Pa. Super. 2005), are distinguishable. As the Superior Court of Pennsylvania explained in *Iron Age*,

> [i]n *Air Products*, the employee possessed intimate knowledge of his former employer's research and development data for on-site gas delivery technologies. The employee's new employer was attempting to develop similar technologies, and the employee was hired to provide research and development data obtained through his previous employment. In [*Iron Age*], Appellee possesses no such technical knowledge, and Appellee's new employer already has an extensive customer base. Appellee was not hired to provide information he obtained through his employment with Appellant.

*Id.* at 664 (citation omitted).

In the instant case, ITW entered into the CA with Sproule and S&B with the intent to improve upon the perlite formulation it purchased from Pamsil in Monterrey. Under the terms of the CA, Sproule and S&B agreed to consult, design, and/or provide the following services to ITW: (1) laboratory for the development and testing of perlite silicate formulations, (2) develop software to track and compare all data gathered from experiments, (3) improve thermal conductivity, reduce friability, and decrease overall breakage of product, (4) perlite silicate mixing system, (5) perlite sectional and block forming system, (6) perlite sectional and block drying methods, (7) perlite sectional and block packaging methods, (8) perlite expansion system, (9) project to improve perlite strength to reduce breakage propensity. (Def.'s Ex. 1 at 1). The Court, therefore, finds that ITW is attempting to develop similar technologies to IIG and that ITW entered into the CA so that Sproule and S&B could provide research and development data obtained through prior knowledge and experience in the perlite manufacturing business, specifically, the Trade Secrets to which it had access under the terms of the APA and the LA.

Accordingly, the Court finds that injunctive relief is proper because there is a high likelihood that the Trade Secrets, specifically the formula and process for manufacturing perlite, will be disclosed. Sproule's duties under the terms of the CA will make it impossible for him not to disclose IIG's Trade Secrets.

The Court concludes that the plaintiff has established by a preponderance of the evidence that there is a substantial likelihood it will prevail on the merits of the trade secret misappropriation claim. Additionally, the Court finds that there is a substantial threat of irreparable harm should the Court decline to grant injunctive relief because once the trade secrets are made available to ITW, the plaintiff's competitor, this cannot be reversed. Additionally, the threatened injury of its trade secrets falling into the hands of a competitor outweighs the threatened harm to the defendants, and granting the preliminary injunction will not disserve the public interest. Although the defendants and ITW planned to construct a manufacturing facility in Houston, which would provide employment in and economic benefits to the community, the Court finds that enforcing the nondisclosure agreements and protecting the trade secrets in this case outweigh this benefit.

III.     Conclusion

For the reasons set forth above, the Court hereby

ORDERS that Plaintiff's request for a preliminary injunction is GRANTED. The Court further

ORDERS that Defendants Sproule, SMC, and S&B, their successors and assigns, and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this Opinion and Order by personal service or otherwise, are hereby enjoined from working for or acting as an employee, partner,

- 20 -

stockholder, investor, owner, director, agent, or consultant for ITW and any of its related companies or businesses.  Defendants are further enjoined from using or disclosing any of the Trade Secrets conveyed pursuant to the APA and the LA outside the terms of Defendants' license for same as set forth in the APA and the LA.  The Court further

ORDERS that this case is referred to Magistrate Judge Frances Stacy for a Scheduling Conference.

SIGNED at Houston, Texas, this 28th day of January, 2009.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE